1    Charles Devon Garrett CDC # BJ9946

2    P.O. Box 921 C-5  cell #131

3    Imperial, Ca 92251

4    Petitioner in Pro se

**LODGED**

**AUG 2 9 2022**

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

11   CHARLES DEVON GARRETT              No. 1:22-cv-00899(JLT)(HBK)

12                    Petitioner,

13            V.                         Amended Petition

14   SHAWN MOORE,                        For Collateral Relief

15                    Respondent.        Pursuant to Rule 15

17   TO THE ABOVE ENTITLED COURT:

19        Petitioner respectfully request this honorable court to take

20   judicial notice of the amended petition that arrives to this

21   honorable court. The Amendments to Petitioner's Petition presents

22   additional facts and evidence underlying all his claims that will

23   strengthen the sufficientcy in establishing by clear and

24   convincing evidence that but for constitutional error no

25   reasonable fact-finder would have found Petitioner guilty of

26   the underlying offenses; Petitioner asserts he is legally innocent.

27   All information on the original petition remains the same.

28        This motion will be based on this notice of motion,

**RECEIVED**

AUG 29 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____DEPUTY CLERK

1

1  declaration, on all points and authorities in said motion, on
2  all assertions rendered in the original petition, and in support
3  of the discovery motion, all in which is currently, pending
4  in this honorable court.

10  Dated : 8-24-22                              Respectfully Submitted,

12                                              Charles Devon Garrett
13                                              Petitioner in Pro se

1    DISTRICT ATTORNEY DANIEL WALTERS DEPRIVED
2  PETITIONER OF HIS LIFE AND LIBERTY BY WITH-
3  HOLDING EXCULPATORY EVIDENCE FROM PETITIONER
4  AND THE COURT, MR. WALTERS WILLFUL INTENT WAS
5  TO SUBTERFUGE THE MATERIAL EVIDENCE IN ORDER
6  TO PROCURE A WRONGFUL CONVICTION. HAD THE MATERIAL
7  EVIDENCE BEEN DISCLOSED TO THE COURT OR GIVEN TO
8  TRIAL COUNSEL THE RESULT OF THE PROCEEDING WOULD
9  HAVE BEEN DIFFERENT. BRADY VIOLATION

10
11       Detective John Mendes intial investigation began March 1,
12  2018, when a gentlemen by the name Isaac Faytock reported
13  his GMC Denali truck stolen, along with three handguns (9MM
14  Ruger, 40.cal Tauras, 380.cal Ruger), and a black Motorola Razor
15  Max HD cell phone. The stolen GMC Denali truck was found the
16  next day March 2, 2018, at 4273 N. Durango Ave, however, the
17  stolen handguns were not recovered and were still missing, the
18  stolen cell phone was also still missing, this particular investigation
19  is docketed under Police case 18-14702.
20       On March 27, 2018, there was a shooting that occured at
21  949 N. Parkway Ave at the Sierra Inn hotel, police recovered a
22  spent 9MM Luger head stamp shell casing at the scene, nobody
23  was present upon police arrival. On March 29, 2018, Petitioner
24  was accused of "brandishing a gun while yelling gang slurs", police
25  officers arrived to 2255 S. Plumas Ave, where Petitioner was
26  taken into custody. Police officers found a 380 Cal. Ruger at the
27  2255 S. Plumas Ave location, before Petitioner was taken into
28  custody, he had a discussion with the arresting officer Nicolas

3

1    Romero #P1677.

2      During this conversation with Officer Romero, Petitioner

3    advised Officer Romero that, "Petitioner was a victim of a

4    car theft, just two days prior to March 29, 2018". Petitioner

5    went on to tell officer Romero, that "the reason why he is

6    in the area of 2255 S. Plumas Ave was because he needed help

7    locating his car, and he asked a few friends to help him

8    with the search". Officer Romero then stated "I don't believe

9    you, if you can verify that story, I'll cut you loose.", So

10   Petitioner, thinking "he will be set free, if he can prove that,

11   he is in fact, a victim of a vehicle theft", which will confirm

12   his story.

13      So Petitioner asked Officer Romero, to call his then

14   girlfriend Felicia Edwards", Petitioner advised Officer Romero that,

15   "Felicia Edwards was the registered owner to his stolen Cadillac,

16   and she (Ms. Edwards) reported the car stolen, so if you call

17   her she will confirm Petitioner's story". Officer Romero agreed

18   to call Ms. Edwards from his (Romero) cell phone, Petitioner gave

19   Officer Romero Ms. Edwards phone number, Officer Romero then

20   called Ms. Edwards and asked her about the car theft that

21   occured March 27, 2018, at 949 N. Parkway Ave. Ms. Edwards

22   answered the phone (not knowing Petitioner was in the back

23   seat of a Police car), Ms. Edwards told officer Romero that,

24   "she (Ms. Edwards) did report her boyfriend car stolen a couple

25   days prior to the phone call with Officer Romero". (March 27, 2018)

26      After realizing Petitioner told Officer Romero the truth,

27   with regard to his car being stolen, Officer Romero "did not

28   let Petitioner go!.", Officer Romero learned that, the stolen

                                   4

38U. Cal Ruger that was recovered from a parked buick sedan, belonged to a gentleman by the name Isaac Faytock. Officer Romero made an effort to try an contact Isaac Faytock, whom no longer had an active phone number. Officer Romero then transported Petitioner to an unknown location, then told Petitioner to "step out". Petitioner, by this time, was angry! Because he told Officer Romero the truth, and Officer Romero did not "hold his end of the bargain", with regard to "setting Petitioner free, if he told the truth about his car being stolen". Therefore, Petitioner refused to get out of the police car, Officer Romero, then transported Petitioner to the Fresno County Jail, where he was booked into custody. Officer Romero recovered two cell phones from Petitioner, which he (Romero) booked both cell phones into evidence. (see exhibit A page 1-2)

     Between March 29, 2018 and April 25, 2018, Officer Romero had a discussion with John Mendes. Officer Romero, tipped John Mendes off with a "lead", with regard to John Mendes "stolen gun theft investigation that occured on 1240 N. Crystal Ave" (which is located in the Parkway area). Officer Romero advised John Mendes that, "Petitioner is currently in custody, for possessing one of the stolen guns related to your investigation, Petitioner may be a suspect in the stolen gun theft". Officer Romero also showed John Mendes several body cam footage's of the incident that led to Petitioner's arrest March 29, 2018, at this point, John Mendes labeled Petitioner as a suspect in the stolen gun theft, and a gang member, whom was "attempting to gather up more gang members, to go on Parkway in search of his stolen Cadillac."

     John Mendes, whom was, at this point, "conducting a

1  dual investigation (The stolen gun theft and shooting case)", recieved
2  this mountain of information from his fellow officer Nicolas
3  Romero. Loaded with this information, Jonn Mendes garnered
4  Felicia Edwards number from watching the video footage of
5  Petitioner and officer Romero when Petitioner advised officer
6  Romero "to call his girlfriend (Felicia Edwards), so she could
7  confirm his story (with regard to Petitioner's stolen car)". Jonn
8  Mendes furthers his investigation, knowing that "Petitioner is
9  already in custody". Jonn Mendes was following Felicia Edwards
10 for five days, when he discovered that Felicia Edwards lives
11 at 5296 W. Holland Ave, and sense Jonn Mendes already knows
12 that "Petitioner and Felicia Edwards is in a relationship at the
13 time of his (Jonn Mendes) investigation", Jonn Mendes presumed
14 that, "Petitioner lives there as well".
15      Although the stolen GMC Denali truck was initially
16 reported stolen at 1240 N. Crystal Ave, the truck was found at
17 4273 N. Durango Ave, this particular address is less than one and
18 a half miles from the 5296 W. Holland Ave address. Jonn Mendes
19 conjectured that, "Petitioner was the suspect that stolen Isaac
20 Faytock GMC Denali truck, stolen guns, and the black Motorola
21 Razor Max HD cell phone" (which derived from Officer Nicolas Romero
22 investigation March 29, 2018). Jonn Mendes "speculative theory" was
23 that, "the 9MM Ruger (Isaac Faytock's handgun) was still missing,
24 and that handgun, was used in the shooting that took place
25 at 949 N. Parkway on March 27, 2018, and Petitioner is the
26 shooter". Jonn Mendes also conjectured that, "the remaining
27 stolen guns (9MM Ruger and 40.cal Tauras) would be found at
28 the 5296 W. Holland". (where he believed Petitioner lived)

6

1    Loaded with this blend of conjecture and guesswork, John

2  Mendes applies for a search warrant that would permit him

3  (John Mendes) to obtained the two cell phones that was located

4  at the Fresno County Jail, where Petitioner was currently

5  housed (information that Officer Romero conveyed to John Mendes

6  when he (officer Romero) booked Petitioner into custody March 29,

7  2018). The honorable judge Vogt signed off on the search

8  warrant, Petitioner was under investigation for the following

9  charges; PC 245(a)(2) assault with a firearm, PC 29800(a)(1)

10  felon in possession of a firearm, VC 10851(a) vehicle theft, and

11  PC 186.22(a) participate in a criminal street gang (see exhibit

12  B page 1-4). Petitioner must give notice, that the "missing

13  probable cause segment" will corroborate with these chain

14  of events, with regard to John Mendes initial investigation.

15    Once John Mendes recovered the two cell phones that was

16  booked under Petitioner's property while he was in custody, John

17  Mendes discovered, that one of those cell phones was black Razor

18  Max HD cell phone that belonged to Isaac Faytock. This new

19  discovery, solidified John Mendes "speculative theory" of

20  "Petitioner being a suspect in the stolen gun theft, and he used

21  the stolen 9MM Ruger in the shooting that occured March 27,

22  2018". Due to the close proximity of Felicia Edwards residence

23  and where the GMC Denali Truck was found, coupled with

24  Petitioner being charged for allegedly possessing the stolen 380.cal

25  Ruger (that was initially taken from the GMC Denali Truck), and

26  Mr. Faytock stolen cell phone was found to be in Petitioner's

27  possession the night he was arrested. (March 29, 2018)

28    John Mendes was a 100 percent certain, that the

7

1  remaining stolen guns would be at Felicia Edwards residence, therefore,

2  John Mendes applies for a search warrant in pursuit of recovering

3  Isaac Faytock's stolen firearms, which would the 9MM Ruger that

4  John Mendes believed "was used by Petitioner on March 27, 2018" and

5  the 40.Cal Tauras, which was also still missing, prior to John Mendes

6  investigation. John Mendes conjectured, "that the firearms would be

7  found at the addresses in the affidavit Judge Cardoza signed"

8  (see exhibit C pages 1-14). The initial search was executed May 7,

9  2018, Petitioner was interviewed by detective John Mendes and

10  Brandon Brown on that same day.

11      Petitioner initially waived his right to counsel during the

12  interview, however, Petitioner was represented by counsel Linden

13  Lindahl (who was initially unaware of the interview between

14  Petitioner and detectives on this particular day). Petitioner denied

15  being the shooter on March 27, 2018, and eventually terminated

16  the interview with detectives. On May 10, 2018, Petitioner was

17  charged with the following charges; PC 245 (a)(2) assault with

18  a firearm, PC 29800(a)(1) felon in possession of a firearm, VC

19  10851(a) vehicle theft, and PC 186.22 (a) participate in a

20  criminal street gang. John Mendes also contacted Isaac

21  Faytock via telephone on May 10, 2018, Mr. Faytock stated

22  "he does not know Petitioner and Petitioner does not have

23  permission to have his cell phone or handgun" (see exhibit D

24  page 1-2).

25      Detectives did not find any of Isaac Faytock's firearms

26  during the search of both addresses and vehicle that is listed

27  in John Mendes affidavit. Petitioner would also like to make

28  a record showing that "he knew nothing about Isaac Faytock's

8

1  stolen vehicle, or his stolen property". The cell phone that
2  Petitioner had in his possession (that happened to be Isaac
3  Faytock cell phone), that cell phone, came from an associate of
4  Petitioner, and he was holding it, after his associate "took off
5  running" when the police arrived at 2255 S. Plumas ave, and
6  the associate of Petitioner dropped it on the floor, prior to
7  him "fleeing from the scene upon police arrival", so that's how
8  Petitioner obtained the black Razor Max HO cell phone that John
9  Mendes presumed, "he stole from the GMC Denali Truck".
10      In any event, Petitioner went to preliminary for the
11  stolen 380.cal Ruger on May 31, 2018, (see exhibit E pages 24-49).
12  Petitioner must give notice to this honorable court, that the prelimin-
13  ary transcript in exhibit E, was included in Petitioner's
14  transcripts with regard to the underlying case, however, the
15  transcripts omits both search warrants that is attached to
16  the amended petition that arrives to this honorable court. In any
17  event, Petitioner was acquitted by jury August 18, 2018, under
18  case no. F18902214, however, Petitioner was not released due to
19  the pending charges mentioned above. When Petitioner was
20  acquitted of the stolen 380.cal Ruger, the vehicle theft charge
21  VC 10851(a) "magically disappeared" from the original charges
22  referenced in the search warrant in exhibit B page 3 lines 3-8. How-
23  ever, the gang enhancement charge 186.22(a) remained on the
24  District Attorney's filing complaint, with regard to the underlying
25  charges.
26      Due to the fact, that Isaac Faytock's firearms "were not
27  recovered" from Felicia Edwards residence, and Petitioner was
28  found Not Guilty for the stolen 380.cal Ruger, District Attorney

1  Mr. Walters willful suborn scheme, was to tailor his (Mr. Walters)
2  entire case, by cutting out, "all the events related to the stolen
3  GMC Denali Truck, and the stolen guns (which ultimately hatched
4  the underlying charges Petitioner was convicted of, due to the
5  causal link of the stolen 380. Cal Ruger that was amongst the
6  stolen gun theft). Petitioner began Preliminary hearing on August 23,
7  2018, Mr. Walters state of mind was malevolent, as he (Mr. Walters)
8  "cut and pasted" material facts that stemmed from the
9  arrest on March 29, 2018. For instance, all the events that led
10 to Petitioner's arrest with regard to the stolen 380.cal Ruger,
11 was pasted into Mr. Walters case, specifically, all the body
12 cam footage that was recorded off officer. Nicolas Romero
13 body cam, was used to establish probable cause at the
14 Preliminary hearing August 23, 2018, (see exhibit F page 1-4 John
15 Mendes sworn testimony).
16      The reason why Mr. Walters methodically veered away
17 from the stolen GMC Denali truck, and stolen gun theft case,
18 that's because, that particular investigation, led to the underlying
19 charges Petitioner was convicted of. And John Mendes direct
20 source of information, came from officer Nicolas Romero, but
21 sense Petitioner was acquitted of the stolen 380.Cal Ruger,
22 the information John Mendes recieved from Officer Romero,
23 coupled with John Mendes investigation while Petitioner was
24 incarcerated, is tainted. This is why, Mr. Walters with held the
25 search warrant in exhibit B, from Petitioner and trial counsel.
26      Petitioner's initial arrest for the stolen 380.cal Ruger is
27 held unlawful as he was acquitted August 18, 2018, therefore,
28 the causal link between the stolen 380.Cal Ruger and it's

relations to the other guns was the Poisonous tree of that illegal arrest, which traveled down the road of subsequent events, with regard to detective John Mendes dual investigation of the stolen gun theft, and shooting case. Mr. Walters malefic intent, with regard to prosecuting the underlying case, was inherently motivated by revenge. Mr. Walters should have known, that the underlying case was the product of the fruit of the poisonous tree. Mr. Walters having knowledge of the law, Mr. Walters relied on the incompetency of trial counsel, and Petitioner's intelligence with regard to deciphering the law. Needless to say, Mr. Walters took advantage of Petitioner hardships, and he (Mr. Walters) utilized the Judicial system as a "Recrimination Mechanism."

Petitioner contends that, without Petitioner's initial arrest for the stolen 380. Cal Ruger, the underlying charges would not exist. Petitioner's initial arrest on March 29, 2018, was the Poisonous Tree, and all the evidence gathered from the unlawful arrest, derived from "fruit of the poisonous tree" rendering Petitioner's conviction and sentence unconstitutional and illegal, which ultimately produced an illegal restraint on Petitioner's life, and liberty in violation of Petitioner's fourth, fifth, sixth, eighth, and fourteenth amendments to the United States Constitution. Mr. Walters is an attorney whom suppose to, "Practice law and Procedure", it is clear from the evidence Petitioner presented, that Mr. Walters "experimented on the law, while manipulating the procedure", just to procure a conviction that he knew was "unlawful". For Mr. Walters to go "great lengths", in a case where Nobody was hurt, proves that, Mr. Walters wanted to get "even" with Petitioner.

1    Petitioner respectfully request this honorable court to take

2  judicial notice of the amended petition, that presents additional

3  evidence that supports the underlying facts of Petitioner's under-

4  lying claims. In closing, Petitioner respectfully request this honorable

5  court to dismiss all charges and release Petitioner from CDCR

6  state Prison, Petitioner must also give notice to this honorable

7  court, that the District Attorney's office dropped and re-filed

8  charges against Petitioner (see exhibit G page 1-2), therefore, the

9  District Attorney's office is precluded from retrying Petitioner,

10  because doing so, would violate Petitioner's United States

11  Constitutional Fifth Amendment right to be free from double

12  jeopardy, Petitioner respectfully request this honorable court

13  to take judicial notice of the amended petition that arrives

14  to this honorable court and grant the relief requested in the

15  interest of Justice. Petitioner declare under penalty of

16  perjury that the foregoing is true and correct to the best

17  of his recollection.

18                              Respectfully Submitted,

19  Dated: 8-24-22

20                              Charles Devon Garrett

21                              Petitioner in Pro Se.

# POINTS AND AUTHORITIES

The Superior Court altered the District Attorney's filing complaint, by silently removing the VC 10851(a) vehicle theft charge from the magistrate case no in exhibit B. see In re Geer (1980) 108 Cal. App. 3d 1002, 1008 also see Penal code § 806§859; In re Harris (1989) 49 Cal. 3d 131, 137. Petitioner contends that the entire search warrant in exhibit B is exculpatory within the meaning of Brady when there is a reasonable probability that, had the search warrant been disclosed to Petitioner or the trial court, the result of the proceeding would have been different. see Cone v. Bell (2009) 556, u.s. 449, 469, 129 S. ct. 1769. Mr. Walters responsibility for failing to disclose known favorable evidence rising to a material level of importance is inescapable. see United States v. Harry, 927 F. Supp. 2d 1185. The entire case derived from the gun possession charge Petitioner was acquitted of, therefore, the evidence that was recovered from both search warrants stemmed from the Fruit of the poisonous tree see Wong Sun v. United States, 371 u.s. 471 (1963). The court in Wong Sun articulated the derivative evidence arising from the fruit of the Poisonous Tree Doctrine Wong Sun supra pp. 371 u.s. 484-487. Petitioner's initial arrest was held unlawful, therefore, all information obtained from the illegality of that arrest is tainted as it stemmed from the poisonous tree, Petitioner's entire case is illegal, Petitioner is illegally restrained of Personal liberty in violation of the fifth and Fourteenth amendments to the United States Constitution. Petitioner's Fourth amendment to be free from illegal search and seizure was violated as he was deprived of his life and liberty, as a result of the search. Because

13

judge Cardoza was actually bias against Petitioner and had a
interest in his underlying case, this proves that Judge Cardoza
can and will disregard the Judicial Conduct canons, while
ignoring the law just to feed the biggotry and bias tendencies
that is deeply rooted; this raises partiality concerns when
she (Judge Cardoza) was acting as Magistrate when she (Judge
Cardoza) signed the search warrant in the first instance.
Petitioner contends that, Judge Cardoza could have acted as a
mere rubber stamp if she relied upon the fact John Mendes
presented a second search warrant that implicated the
honorable Judge Vogt name in the affidavit (see exhibit C page 10
lines 1-2) see e.g United states V. Mueller, 902 F.2d 336, 340 (5th Cir. 1990)
Judge Cardoza was also not a neutral and detached Magistrate
whom was impartial and independant because her (Judge Cardoza)
son is an Attorney for the District Attorney office County of
Fresno and those facts were not disclosed when Judge Cardoza
signed the Search warrant, Mr. Walters with held the search
warrant in exhibit B, that entire search warrant is exculpatory
evidence see United states V. Bagley, 473 U.S. at 676; Brady V.
Maryland, 373 U.S. at 87; Bailey V. Rae, 339 F.3d 1107, 1114-15
(9th Cir. 2003). Petitioner contends that, the search warrant in
exhibit B identifies Petitioners illegal arrest and will show by
clear and convincing evidence that Petitioner's entire conviction
is unconstitutional and illegal due to the fruit of the Poisonous
Tree Doctrine, therefore, all the evidence used in Petitioner's under-
lying case is tainted, and inadmissible which produced a wrongful
conviction. If the evidential "tree" is tainted, so is it's "fruit".
Petitioner contends that, the search warrant in exhibit B is

1  the Poisonous tree, and Mr. Walters concealed that search warrant
2  from Petitioner and trial counsel because Mr. Walters is very
3  aware that, "the fruit of the poisonous tree doctrine prevents the
4  posecution from admitting certain evidence into a criminal case
5  after it has been tainted by a primary illegality." This doctrine
6  is meant to remove illegally acquired evidence from negatively
7  impacting a criminal defendant. The point here is that the
8  derivative evidence doctrine is potentially applicable in any
9  situation where there has been an "initial illegality followed
10 by a chain of events leading to incriminating evidence". Based
11 on the above legal authority, Petitioner respectfully request
12 this honorable court to grant the relief requested in said
13 motion. Petitioner declare under penalty of Perjury that the
14 foregoing is true and correct to this best of his understand-
15 ing of the law and the facts.

16
17
18 Dated : 8-24-22                    Respectfully Submitted,
19
20                                    Charles Devon Garrett
21                                    Petitioner in Pro se
22
23
24
25
26
27
28

# PROOF OF SERVICE BY MAIL

## BY PERSON IN STATE CUSTODY

(Fed. R. Civ. P. 5; 28 U.S.C. § 1746)

I, _Charles Devon Garrett_ , declare:

I am over 18 years of age and a party to this action. I am a resident of _Centinela_

_____ Prison,

in the county of _Imperial, Ca 92251_ ,

State of California. My prison address is: _921 P.O. Box 921_ ,

_____

On _8-24-22    August 24, 2022_ ,
                    (DATE)

I served the attached: _1 Original copy of Amended Petition and Motion For_
_Release On Bail or own Recognizance_
                    (DESCRIBE DOCUMENT)

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope, with postage

thereon fully paid, in the United States Mail in a deposit box so provided at the above-named correctional

institution in which I am presently confined. The envelope was addressed as follows:

_Charles Devon Garrett CDC # BJ9946_           _Office of the Clerk_
_P.O. Box 921 C-5 #131_          _TO_     _United States Distrit court_
_Imperial, Ca 92251_                 _Eastern District of California_
                                     _2500 Tulare street, suite 1501_
                                     _Fresno, Ca 93721_

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on _8-24-22_
            (DATE)                    (DECLARANT'S SIGNATURE)

# PROOF OF SERVICE BY MAIL

## BY PERSON IN STATE CUSTODY

(Fed. R. Civ. P. 5; 28 U.S.C. § 1746)

I, _Charles Devon Garrett_, declare:

I am over 18 years of age and a party to this action. I am a resident of _Centinela_

_____ Prison,

in the county of _Imperial, Ca 92251_,

State of California. My prison address is: _P.O. Box 921 C-5 #131_,

_____

On _8-24-22    August 24, 2022_,
    (DATE)

I served the attached: _1 Copy of Amended Petition, and Motion For Release_

_on Bail or own Recognizance_
              (DESCRIBE DOCUMENT)

on the parties herein by placing true and correct copies thereof, enclosed in a sealed envelope, with postage

thereon fully paid, in the United States Mail in a deposit box so provided at the above-named correctional

institution in which I am presently confined. The envelope was addressed as follows:

_Charles Devon Garrett  CDC # BJ9946        Office of the Attorney General_
_P.O. Box 921 C-5 #131          To:  2550 Mariposa Mall, # 5090_
_Imperial, Ca 92251                 Fresno, Ca 93724_

I declare under penalty of perjury under the laws of the United States of America that the foregoing

is true and correct.

Executed on _8-24-22_
             (DATE)                    (DECLARANT'S SIGNATURE)

EXHIBIT

A

Event: 18-AN3116                                    DRAFT

On 03/29/2018, at approximately 2104 hours, while working uniformed patrol in the Southwest Policing District as a double unit with Officer D. Reed, I was dispatched to a call for service at 2255 South Plumas (Legacy Commons Apartments) regarding a disturbance. The text of the call stated there were two to three subjects outside in the parking lot, and one of them was armed with a gun, possibly wearing a red sweatshirt. I arrived on scene at approximately 2114 hours.

## INVESTIGATION:

I designated California Ave and Tulare Ave as the staging location for the units on the call. I requested Air support to the location, and CHP helicopter (H40) arrived on scene and was maintaining visual overhead. Once we developed a plan, officers went south on Walnut and south on Plumas from California Avenue into the Legacy Commons Apartments where we contacted multiple subjects believed to be involved in the disturbance. All of the subjects were originally seen congregating around a brown Buick vehicle. All the subjects appeared to be associated with Unit # 225. At the location, I saw several gang related subjects that I recognized from prior contacts, to include Elijah Haqq, DOB 09/01/1997, as well as Charles Garrett, DOB 08/10/1987, who I know is a Strother gang member. Upon arrival, I had initially made contact with Charles Garrett who had slurred speech and the odor of alcohol coming from his person.

He stated that he did not live at the location and did not know why he was there. He was originally on the porch area of the residence and made his way down the stairs. During the original contact, one of the females at the location stated that there was a disturbance involving a subject who I also know from prior contact as David Newsome, DOB 06/24/1995. One of the females who did not want to identify herself stated that David Newsome was at the location causing a disturbance. Newsome had left the location in a silver Mercedes Benz prior to my arrival. It should be noted that I have contacted David Newsome in prior events in a silver Mercedes SUV in the area of Geneva Ave and Lorena Ave.

While officers were investigating, I noticed that Garrett was trying to leave the location. Garrett was walking staggered and his pants were falling down exposing his underwear. Due to my belief of Garrett being under the influence of alcohol, I placed him in handcuffs and detained him in the back of my vehicle. Sergeant Price advised that he had located a handgun on the tire of the brown Buick that the subjects were originally seen congregating around. Due to one of the cooperative females being in fear of Garrett, I requested Officer Reed transport him around the corner from the location, so the female would not be seen talking to officers. Refer to Officer Riveras report for the female's statement.

Officers Briseno and Rivera advised me that the female subject wanted to speak to them, and I was present for her interview. During the interview, the female stated that she saw subject Garrett with a firearm in his waistband, and he was yelling, talking about the Strother gang. It should also be noted that David Newsome is also a Strother gang associate. Based on the female's statement, Garrett was determined to be in possession of the firearm that was located and she advised the Officers that she would be willing to testify against Garrett.

I arrived at the vehicle where Garrett was being detained. Based on the investigation, he was placed under arrest for being in possession of the firearm. I know from prior contacts that Garrett has several felony convictions for which he has served both state and federal time for firearms related charges. I provided Garrett with a Miranda Advisement via my Department issued card, and Garrett confirmed that he understood his right by saying, "yes".

The following is a summary of the statement provided to me by Garrett. His statement was recorded by my Department issued body-worn camera, and the recorded footage was uploaded to evidence.com under Case number 18021273.

Event: 18-AN3116                           DRAFT

STATEMENT UNDER MIRANDA PROVIDED BY GARRETT:

Garrett stated that he had originally been a victim of a 10851 from 03/27/2018. The Stolen Vehicle Report was
documented under Case number 18-20852. Garrett stated that he was at the location because he wanted to
gather several of his friends to go to a location to see if his vehicle was where he believed it to be on Parkway
Avenue. Garrett would not provide how he obtained this information. He just kept stating that we arrested the
wrong guy. Garrett stated based on his "code," he is not able to tell who the gun belonged to due to the fact that
in the gang culture it could compromise the safety of himself, his reputation, his children, his girlfriend, as well
as other family members who live in Southwest Fresno, and he would be labeled as a snitch. Garrett also asked
how many guns were recovered at the residence and he stated that there were more out there but not say where
the could be located.

Garrett stated that he would never have a gun and is too old to do so. He stated that he has been out of prison for
approximately three years. He stated that he has a job, works full time, and provides for his family. He stated
that there was a disturbance between the subjects, but would not clarify what it was about. He stated that he has
been upset because his vehicle was stolen recently and wanted to get it back.

When I asked Garrett why the females would state that he was brandishing a gun in his waistband and yelling at
the occupants of the residence, he stated that the females were not present during the disturbance. Garrett
believed the victim made the statements against him due to his prior firearm history and in order to protect their
boyfriends. Garrett was certain that the males at the location would not say that he was in possesion of a gun nor
cooperate with law enforcement at all.

**INVESTIGATION CONTINUED:**

Assisting officers ran the serial number of the Ruger .380 pistol that was located (serial number 37116018 7).
The gun was shown to be stolen out of Fresno under Case number 18-14702. I made an effort to get in touch
with the victim who was listed as Isaac Faytock, DOB 06/28/1986; however, the number that was listed in the
police report was no longer an active phone number.

I ran a Criminal History Check of Garrett and located a felony conviction from 04/25/2011 regarding a Felon in
Possession of a Firearm. In addition, there were multiple prior felony convictions with the one in 2011 being the
most recent that I was able to see. Based on this conviction, Garrett is prohibited from being in possession of a
firearm. Initially, Garrett was transported to CSIS where he was processed; however, he would not allow the
cadet to process him and was being uncooperative. He was transported directly to Fresno County Jail where he
was booked on the above listed charges. The two cell phones that were located on Garrett's person were booked
into Evidence by Officer Reed.

**CONCLUSIONS/ DEDUCTIONS:**

On 03/29/2018, I responded to a location regarding a disturbance between several subjects, and one subject
brandishing a firearm. Based on the statement provided by a Victim and positively identifying the Suspect as
Garrett, he was found to be in violation of the above listed charges. He was identified via his name and date of
birth, and his identity was confirmed via a prior booking photograph. Refer to original and supplemental reports
for additional information.

**DISPOSITIONAL INFORMATION:**

1.  Suspect booked in FCJ.
2.  Body cam footage uploaded to evidence.com.

Officer: ROMERO (V3770), NICOLAS #P1677                                Page 4 of 5
Supervisor: RIVERA (V3105), ANTONIO #S215

EXHIBIT
B

**SUPERIOR COURT OF CALIFORNIA • COUNTY OF FRESNO**
1100 Van Ness Avenue
Fresno, California 93724-0002

| AGENCY CASE NUMBER: | **SEARCH WARRANT** | WARRANT NUMBER: |
|---|---|---|

The PEOPLE OF THE STATE OF CALIFORNIA to any peace officer in Fresno County.

The affidavit below, sworn and subscribed before me, has established probable cause for this search warrant which you are ordered to execute as follows:

**Place(s) to be searched:** Described in Attachment A, attached hereto and incorporated by reference.

**Property to be searched:** Described in Attachment B, attached hereto and incorporated by reference.

**Night service:** [If initialed by Judge] For good cause shown, as set forth in the Statement of Probable

Cause, night service is authorized: _____

**Disposition of Property:** All property seized pursuant to this search warrant shall be retained in the affiant's custody pending further order of the court, pursuant to Penal Code §§ 1528(a) & 1536.

**X** -**The oath was administered orally over the telephone by the magistrate to the affiant.**

| **4/27/2018 9:55:59 AM** | |
|---|---|
| Date and time warrant issued | Judge of the Superior Court |

## AFFIDAVIT

**Incorporation:** The facts in support of this warrant are contained in the Statement of Probable Cause which is incorporated by reference. Also, incorporated by reference and attached hereto are Attachment A, describing the place(s) to be searched; and Exhibit B, describing the evidence to be seized.

**Evidence Type:** (Penal Code § 1524)

- ☐ Stolen or embezzled property.
- ☑ Property or things to be used as a means of committing a felony.
- ☐ Property or things in the possession of any person with the intent to use it as a means of committing a public offense, or in the possession of another to whom he or she may have delivered it for the purpose of concealing it or preventing it from being discovered.
- ☑ Property or things that are evidence that tends to show that a felony has been committed, or tends to show that a particular person has committed a felony.
- ☐ Property or things that are evidence that tends to show that sexual exploitation of a child, in violation of Penal Code §311.3, or possession of matter depicting sexual conduct of a person under the age of 18 years, in violation of Penal Code §311.11 has occurred or is occurring.
- ☐ Other: _____
- ☐ Night Service: [If checked] Authorization for night service is requested based on information in the Statement of Probate Cause, filed herewith.

**Declaration:** I declare under penalty of perjury that the information within my personal knowledge contained in this affidavit, including all incorporated documents, is true.

| April 27, 2018 | /S/ Detective John Mendes # P1413 |
|---|---|
| Date | Affiant |

FCR-26 E12-13      **SEARCH WARRANT**      Warrant ID: 000009419

1    <u>ATTACHMENT "A"</u>

2    **YOU ARE THEREFORE COMMANDED TO SEARCH:**

3        1.) A Motorola brand cell phone currently under the custody of the Fresno Police Department

4            under case 18-21273.

5        2.) A LG brand cell phone currently under the custody of the Fresno Police Department under

6            case 18-21273.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Warrant ID: 000009419

1  **ATTACHMENT "B"**

2  **FOR THE FOLLOWING PROPERTY:**

3  1.) To conduct a forensic analysis of the cell communications devices described in Attachment

4  "A" in an attempt to recover all data between March 1, 2018 and March 30, 2018 that

5  constitutes evidence and instrumentalities of PC 245(a)(2) – assault with a firearm, PC

6  29800(a)(1) – felon in possession of a firearm, VC 10851(a) – vehicle theft, and PC 186.22(a) –

7  participate in a criminal street gang including communications referring or relating to this

8  investigation.

9  a.  All communications content, including e-mail, text (SMS / MMS or app chats), notes, or

10  voicemail. This data will also include attachments, source, destination addresses, and

11  time and date information, and connection logs, images together with indicia of use,

12  ownership, possession, or control of such communications or information found;

13  b.  All location data for the dates above. Location data may be stored as GPS locations or

14  cellular tower connection data. Location data may be found in the metadata of

15  photos and social networking posts, Wi-Fi logs and data associated with installed

16  applications;

17  c.  Photographs, audio, video and associated metadata related to the criminal activity

18  described in this affidavit in support of search warrant;

19  d.  Internet browser files for the dates above including by way of example and not

20  limitation, browser history, browser cache, search terms, stored cookies, browser

21  favorites, auto-complete form history and stored passwords;

22  e.  Call histories and call logs related to the criminal activity that is further described in this

23  affidavit in support of the search warrant;

24  f.  All indicia of ownership and control for both the data and the cellular device, such as

25  device identification and settings data, address book / contacts, social network posts /

26  updates / tags, Wi-Fi network tables, associated wireless devices such as known Wi-Fi

1    networks and Bluetooth devices, associated connected device (such as for backup

2    and syncing), stored passwords, user dictionaries, and assigned phone number.

3       g. All indicia of street gang membership or affiliation with any street gang, said

4         paraphernalia such as reference to the Strother criminal street gang.

5       h. The make and model, manufacture, most recent revision number, the mobile

6         equipment identifier (MEID), and the international mobile subscriber identity (IMSI);

7    2.) With respect to the above listed items listed in # 1 and its subsections above, the executing

8       law enforcement officers are authorized, at their discretion, to conduct an offsite search of the

9       seized items for the property described. Investigating officers and those agents acting under

10      the direction of the investigating officers are authorized to access all data on the cellular

11      device to determine if the data contains the items as described above. If necessary,

12      investigating officers are authorized to employ the use of outside experts, acting under the

13      direction of the investigating officers, to access and preserve data on the cellular device.

14      Those items that were within the scope of this warrant may be copied and retained by

15      investigating officers.

16   3.) As required by California Penal Code 1546.1(d); any information obtained through the

17      execution of this warrant that is unrelated to the objective of the warrant shall be sealed and

18      shall not be subject further review, use or disclosure absent an order form the Court.

19   **Target Notification Delay Order:**

20      Your Affiant is aware that Penal Code 1546.2 mandates that the law enforcement agency

21   serving this warrant notify the target of the warrant contemporaneously with the service of the

22   warrant unless in order to delay notification is granted. Your Affiant believes that compliance with the

23   notice requirement would cause one or more of the following "adverse results":

24      1.) Flight from prosecution

25      2.) Tampering or destruction of evidence

26      3.) Seriously jeopardizing an investigation or unduly delay in trial

Warrant ID: 000009419

EXHIBIT

C

# SUPERIOR COURT OF CALIFORNIA • COUNTY OF FRESNO
Prob Valley Ness Avenue
Fresno, California 93724-0002

| AGENCY CASE NUMBER: | SEARCH WARRANT | WARRANT NUMBER: |
|---|---|---|

The PEOPLE OF THE STATE OF CALIFORNIA to any peace officer in Fresno County.

The affidavit below, sworn and subscribed before me, has established probable cause for this search warrant which you are ordered to execute as follows:

**Place(s) to be searched:** Described in Attachment A, attached hereto and incorporated by reference.

**Property to be searched:** Described in Attachment B, attached hereto and incorporated by reference.

**Night service:** [If initialed by Judge] For good cause shown, as set forth in the Statement of Probable

Cause, night service is authorized: _____

**Disposition of Property:** All property seized pursuant to this search warrant shall be retained in the affiant's custody pending further order of the court, pursuant to Penal Code §§ 1528(a) & 1536.

☒ The oath was administered orally over the telephone by the magistrate to the affiant.

| 5/2/2018 3:13:12 PM | Tom Cardoza |
|---|---|
| Date and time warrant issued | Judge of the Superior Court |

## AFFIDAVIT

**Incorporation:** The facts in support of this warrant are contained in the Statement of Probable Cause which is incorporated by reference. Also, incorporated by reference and attached hereto are Attachment A, describing the place(s) to be searched; and Exhibit B, describing the evidence to be seized.

**Evidence Type:** (Penal Code § 1524)

- ☑ Stolen or embezzled property.
- ☑ Property or things to be used as a means of committing a felony.
- ☐ Property or things in the possession of any person with the intent to use it as a means of committing a public offense, or in the possession of another to whom he or she may have delivered it for the purpose of concealing it or preventing it from being discovered.
- ☑ Property or things that are evidence that tends to show that a felony has been committed, or tends to show that a particular person has committed a felony.
- ☐ Property or things that are evidence that tends to show that sexual exploitation of a child, in violation of Penal Code §311.3, or possession of matter depicting sexual conduct of a person under the age of 18 years, in violation of Penal Code §311.11 has occurred or is occurring.
- ☐ Other: _____
- ☐ Night Service: [If checked] Authorization for night service is requested based on information in the Statement of Probate Cause, filed herewith.

**Declaration:** I declare under penalty of perjury that the information within my personal knowledge contained in this affidavit, including all incorporated documents, is true.

| May 2, 2018 | /S/ Detective John Mendes # P1413 |
|---|---|
| Date | Affiant |

ATTACHMENT "A"

YOU ARE THEREFORE COMMANDED TO SEARCH:

1.) <u>5296 W. Holland Ave, Fresno, California:</u>

5296 W. Holland Ave in the City of Fresno and in the County of Fresno, State of California. It is further described as a single story residence with a grey composite roof, light blue trim and a light yellow stucco exterior. A portion of the front of the residence has two feet of red brick along the bottom of the exterior wall. It is located on the north side of W. Holland Ave between N. Ellendale Ave and N. Dante Ave. The front door of the residence faces south and the number "5296" is posted in black numbering on a white placard to the west of the white garage door. There is no security screen door.

This search is to include all rooms, attics, basements and other parts therein, the surrounding grounds and any garages, storage rooms, trash containers, safes, travel trailers or campers, vehicles and outbuildings of any kind located thereon. I have observed the residence and I will be present or an officer I designate while conducting the search warrant.

2.) <u>2331 N. Prospect Ave, Fresno, California:</u>

2331 N. Prospect Ave in the City of Fresno and in the County of Fresno, State of California. It is further described as a two story residence with white trim and a tan wooden exterior. It is located on the west side side of N. Prospect Ave between W. Vassar Ave and W. Cambridge Ave. The front door of the residence is covered by a tan security screen and faces an eastern direction. The number "2331" is posted in black numbering on a white placard to the north of the garage door.

This search is to include all rooms, attics, basements and other parts therein, the surrounding grounds and any garages, storage rooms, trash containers, safes, travel trailers or campers, vehicles and outbuildings of any kind located thereon. I have observed the residence and I will be present or an officer I designate while conducting the search warrant.

3.) <u>A silver Dodge Charger, California license DP958JR:</u>

A silver 2010 Dodge Charger sedan bearing California license plates DP958JR and vehicle identification number (VIN) 2B3CA3CV0AH217016; including containers of any kind within the vehicle.

This warrant also authorizes officers to detain and search all occupants of the residences and to include their vehicles and containers within the vehicles, if parked on the grounds of or adjacent to said residence, and any other vehicles under the control of the suspects associated with the activities at the residence and to stop, detain and identify individuals that arrive at the residence, while this search warrant is being executed.

ATTACHMENT "B"

FOR THE FOLLOWING PROPERTY:

1.) For a 9mm caliber semi-automatic handgun or any other firearms that are illegally possessed. Any magazine that would seat 9mm caliber cartridges or any live or expended 9mm caliber cartridges. Any evidence related to the possession or use of a firearm including spent casings, any miscellaneous gun/firearm pieces, ammunition, gun cleaning items or kits, holsters, ammunition belts, original box packaging materials, clip/magazine/cylinders/loading devices, targets, expended pieces of lead/bullets, any photographs of firearms, or any paperwork showing the purchase, storage, disposition, and/ or dominion and control over any guns, any ammunition, or any of the above items, or any other weapon that investigators can reasonable prove may have been used in the commission of the crime.

2.) A black Ruger brand 9mm caliber handgun, serial number 33763495.

3.) A black .40 caliber Taurus brand handgun.

4.) Cell phones found that could belong to and/or under the control of the suspects. I am requesting the authority to seize the cell phones. The cell phones would not be searched absent a further court order authorizing the search of them.

5.) Clothing worn by suspect Charles Garrett the day of the shooting and as seen in surveillance video; a dark colored t-shirt with a large white design or lettering on the front and long khaki colored shorts.

6.) Any items tending to establish the identity of persons who have dominion and control of the location, premises, automobiles, or items to be seized, including delivered mail, whether inside the location or in the mail box, bills, utility bills, telephone bills, miscellaneous addressed mail, personal letters, personal identification, purchase receipts, rent receipts, sales receipts, tax statements, payroll check stubs, fingerprints, D.N.A., keys and receipts for safe deposit box(s), keys and receipts for rental storage space, keys and receipts for post office box or mail drop rentals, ignition keys, car door and trunk keys, vehicle ownership certificates or "pink slips,"

and/or vehicle registration slips, and photographs tending to show occupants of the residence / business and connection between co-conspirators, where identified, or unidentified, and also items of personal identifying information that would tend to show the suspects' dominion and control over any other locations in which the suspects would store firearms, valued gang indicia, and other items of evidentiary value.

However, in the discretion of the officers executing this search warrant, any of the above-described property may be photographed by the officers instead of being physically seized. Also, in the discretion of the officers executing this search warrant, a sample or portion of the above described property may be seized.

AFFIDAVIT:

I, John Mendes, hereinafter referred to as, Your Affiant, have been employed as a Fresno Police Officer for over twelve years. When I started in 2005 I was assigned as a patrol officer working all of the policing districts for the next four years. I was then assigned to several tactical teams; the Southwest District Crime Suppression Team (DCST), Violent Crime Impact Team (VCIT) and the South Bureau Impact Team (SBIT). In 2014 I was assigned as a property crime detective for the Southeast Policing District. I am currently assigned to the Street Violence Bureau as a Felony Assault Detective.

Your Affiant's formal education consists of a Bachelor of Science degree in Criminology with an emphasis on law enforcement from California State University Fresno. I attended the police academy in Fresno California and completed in excess of 800 hours of training in the academy. Through my previous varied assignments, your Affiant has had the occasion to be at the scene of many felony crime scenes which includes homicides, assault with a deadly weapons, robberies/carjacking's, shootings, burglaries, domestic violence crimes, weapon related offenses, various property crimes and narcotic violations as both a patrol officer and investigator.

My current duties as a Felony Assault Detective involve investigating violent crimes, such as shootings and stabbings. I am assigned cases to conduct follow up investigation and assist in the identification and potential prosecution of wanted subjects in various crimes. In connection with my current assignment and past assignments I have personally been involved in over 100 felony assault investigations as either a primary investigator or as an assisting officer. As a result of this training and experience I am familiar with various methods used by persons engaged in these criminal activities. I have also become familiar with the types of evidence that are pertinent to these investigations. I know that evidence which commonly can provide information to the motive, evidence of individuals involved and those responsible for the crime can often be found within their residence, the residences of the suspect's associates, vehicles, cell phones and social media.

**STATEMENT OF PROBABLE CAUSE:**

During the course of my duties, I have learned the following information based upon my discussions with the named witnesses or by having read the reports of or talked with other police officers who have spoken directly with the named witnesses. The following documents me and my fellow officer's investigation into this matter and establishes probable cause for the issuance of a search warrant.

On April 24, 2018 I was working as felony assault detective assigned to the Fresno Police Department's Street Violence Bureau. I was assigned to investigate a shooting that occurred on 3-27-18 at the Sierra Inn, 949. N. Parkway Dr. I reviewed the police reports that had been prepared and saw the shooting had been captured on the hotel's surveillance video system. I also saw the victim was gone upon police arrival and was unidentified. Officers located one expended 9mm caliber cartridge case on scene.

I reviewed the surveillance video from the hotel and saw a silver Dodge Charger enter the hotel parking lot prior to the shooting. The Dodge Charger made a U-turn and exited back on to Parkway Dr. The suspect can then be seen walking up to the victim who is standing in front of the hotel. A physical disturbance occurs between the two and the suspect brandishes a firearm and points it towards the victim; I then see one muzzle flash from the handgun. It does not appear the victim is struck by the gunfire and both the victim and suspect walk away. In watching the video I noted the suspect is wearing a dark colored t-shirt with large white lettering or design on the front and long khaki colored shorts.

In reviewing the police reports I saw a detective from the Night Detective Unit contacted a witness at the hotel. The witness stated he was outside smoking a cigarette and saw the shooting. The witness said during the disturbance the suspect said something about a stolen gold Cadillac. The suspect was described as a black male, in his 30's, bald, with facial hair and a goatee.

Based on the information I began to research recently stolen Cadillac's in the City of Fresno. While doing this I located a tan 1996 Cadillac that had been reported stolen about one hour prior t

the shooting I was investigating. I noted the Cadillac was stolen from the Amstar gas station located at 1680 W. Olive Ave. This is less than a half mile away from where the shooting occurred.

I researched the female, Felicia Edwards that reported the Cadillac stolen and saw she had prior contacts in Fresno Police Records Management System (RMS) with a Charles Garrett (date of birth 08-10-1987). I looked at a prior booking photograph of Garrett and his physical descriptors, noting he matched the description of the suspect.

I conducted further computer research on Garrett and saw he had been arrested two days after the shooting on 3-29-18 for firearm charges including being an ex-felon in possession of firearm. Garrett had been arrested after Fresno Police Officers responded to the Legacy Commons Apartments (2255 S. Plumas Ave) regarding a disturbance.

Upon arrival at the Legacy Commons the officers contacted multiple people believed to be involved in the disturbance including Garrett. Officers also contacted the reporting party who said two subjects including Garrett came to her apartment to start a fight with her child's father. The reporting party said during the disturbance Garrett displayed a pistol in his waistband and stated "I'm going to flat line your ass" which she believed is a term referring to kill. She said Garrett also stated "Strother, over here, I'm not running from nobody" during the disturbance. When Garrett saw the police vehicles entering the apartment complex he walked over to the carport area and placed the pistol on the rear tire of a vehicle parked in the parking lot.

During the investigation a Fresno Police Sergeant located a handgun on the rear wheel of a vehicle parked in the parking lot. The handgun was a .380 caliber Ruger brand handgun. The handgun was found to be stolen out of the City of Fresno on 3-1-18. Garrett was found to be a convicted felon and booked into Fresno County Jail for numerous firearm charges.  Upon being booked into jail he admitted to being a Strother criminal street gang member. He is still currently in jail.

I reviewed the case regarding the stolen handgun and saw the handgun was stolen along with two others when the vehicle they were contained in, a black 2011 GMC Denali was stolen from

1  1240 N. Crystal Ave. I saw one of the handguns stolen was a 9mm which is the same caliber of the

2  expended cartridge case that was found on scene of the shooting. I also noted the Denali was

3  stolen from 1240 N. Crystal Ave. which is the business directly to the north of the Amstar gas station

4  where the Cadillac was stolen. I further saw the stolen vehicle was recovered on the day after it was

5  stolen (3-2-18) utilizing On-Star at 4273 N. Durango Ave.

6      On 4-25-18 I contacted the witness who reported the shooting. I showed the witness a six-

7  picture photo line-up containing a prior booking photograph of Garrett. The witness pointed at

8  Garrett's picture and stated he cannot be 100 percent sure but he is "pretty damn sure" Garrett is

9  the shooting suspect. He also described the suspect vehicle as a grey "bone stock" Charger that was

10  being driven by a female. He said the female was African American, in her late 20's – early 30's and

11  a "bigger girl". I noted this description matches Edwards who I have learned is Garrett's girlfriend. I

12  later made a six picture photo line-up containing a picture of Edwards and showed it to the witness

13  who was unable to identify Edwards.

14      On 4-26-18 I drove by Edwards's place of employment and observed a stock silver Dodge

15  Charger, California license DP958JR parked across the street. I noted the Charger has a small sticker

16  in the back window which is visible in the surveillance video and I believe it is the suspect vehicle in

17  the shooting. I saw the vehicle is registered to Edward's father (Ronald Edwards).

18      Detective Brown reviewed jail calls made by Garrett since he has been in-custody. He has

19  made multiple phone calls to Edwards at (559) 596-4019. He made phone calls to her at this number

20  in jail booking and as recently as 4-26-18. This is the same phone number Edwards contacted police

21  with regarding the stolen Cadillac on 3-27-18.   During a jail call Garrett talked to Edwards and they

22  had a conversation about the house where they are living being locked and Edwards being locked

23  out; indicating they have been living together.

24      Based on the investigation on 4-27-18 I authored a search warrant for T-Mobile, USA which is

25  the network provider for Edwards' cell phone number. The search warrant demanded cell phone

26

records and the live location of the cell phone. The search warrant was signed by the Honorable Judge Vogt of the Fresno County Courts that same day.

On 4-28-18 I received the phone records back from T-Mobile, USA. I saw she was the registered subscriber for the cell phone. I noted the shooting occurred at 949 N. Parkway Dr and it was on 3-27-18 at 2131 hours. In looking at her cell phone records I saw her cell phone connected with a cell phone tower located at 959 N. Parkway Dr at the time of the shooting.

On 5-1-18 I checked the two other handguns that had been stolen from the GMC Denali to see if they had been recovered by law enforcement. One of the handguns was a black .40 caliber Taurus brand handgun with no documented serial number. The other handgun is a black Ruger brand 9mm caliber handgun, serial number 33763495. I confirmed this handgun had not been recovered by law enforcement.

## NEXUS TO LOCATIONS:

5296 W. Holland Ave, Fresno, California:

I saw Edwards reported she lived at 5296 W. Holland Ave when she reported the Cadillac stolen on 3-27-18. When I checked the license plate reader database I saw the suspect vehicle, a grey Dodge Charger had been read by a license plate reader on 3-10-18 at 1806 hours while in the driveway of this location. In checking the call detail records provided by T-Mobile, USA I saw her cell phone was consistently connecting with a cell phone tower located at 5472 W. Shaw Ave and in a southern direction consisted with her staying here.

On 5-1-18 I drove by this location and I observed the recovered stolen Cadillac that is registered to Edwards is parked along the curb in front of the residence. I also observed another Cadillac, California license 4GST097 which is also registered to Edwards parked behind it. In the driveway of their residence there is a wrecked black KIA Sorrento parked. Due to heavy front end damage I am not able to see a license plate but I noted on 2-24-17 Edwards reported a black Kia Sorrento stolen after it had been involved in a hit and run traffic collision. Edwards gave conflicting

1  statements to officers and hit and run detectives about whether her vehicle was stolen or not. I

2  reviewed photographs from this report and believe it to be the same vehicle.

3  ~~I also noted when the stolen GMC Denali was recovered from 4273 N. Durango Ave this is less~~

4  ~~than one and a half miles from this residence.~~

5  <u>2331 N. Prospect Ave, Fresno, California:</u>

6     On 4-28-18 upon receiving location information for Edwards' cell phone I saw her cell phone

7  consistently showed at 2331 N. Prospect Ave consistent with her staying here. Many of this "pings"

8  were less than 10 meters. On 4-30-18 I drove by the residence and saw the suspect vehicle parked in

9  front of it. On 5-1-18 I returned to the location and again saw the suspect vehicle; this time it was

10  parked across the street from the location. While watching the residence at 0807 hours I saw Edwards

11  leave the residence with two children about 6 to 8 years of age and walk across the street. All three

12  of them got into the suspect vehicle and drove away.

13

14  <u>OPINIONS AND CONCLUSIONS:</u>

15     Based on your Affiant's training and experience I know that firearm and firearm paraphernalia

16  are not the types of items normally disposed of and in high probability will still be found at the

17  locations, vehicles or on the persons to be searched despite the short lapses of time between the

18  commission of this crime and the service of this search warrant. Furthermore your Affiant knows from

19  his training and experience gang members / criminals that are illegally in possession of firearms and

20  ammunition will also conceal their firearms and ammunition and/or evidence of their criminal

21  involvement in vehicles, attics, basements, detached garages, storage buildings, unused

22  recreational vehicles, travel trailers, outbuildings, storage containers and other hidden

23  areas/compartments, and inside walls where officers would not easily detect them during a search of

24  a residence.

25     Based on your Affiant's training and experience I know that gang members / criminals who

26  are arrested or viewed in possession of illegal firearms commonly have additional firearms and

firearm paraphernalia at their residence(s), where they have been staying and / or in their vehicles. Some of these paraphernalia items include, spent casings, miscellaneous gun/firearm pieces, ammunition, gun cleaning items or kits, holsters, original box packaging material, magazines, targets, expended pieces of lead/bullets, any photographs of firearms or any paperwork showing the purchase, storage, disposition and/or dominion and control over any guns/ any ammunition or any of the above items. Your Affiant believes that whether or not the firearm sought is recovered, the above firearm paraphernalia would tend to show that a firearm existed and may have once been located in a place to which the suspects had access and these items would tend to connect the suspects with the firearms seized.

Based on your Affiant's training and experience I know that oftentimes gang members / criminals will use cellular communication devices before, during and after committing their crimes. The participating criminals will communicate with others to assist, plan, while carrying out their crimes and after their crimes. They will often use the cellular communication device before their crime to coordinate and plan the crime. They will use the cellular communication device during the commission of the crime to monitor police radio traffic and alert co-conspirators of arrival of victims, witnesses and law enforcement. After the crime they will use the cellular communication device to contact others seeking help, advice, making plans to conceal or destroy evidence or to tell others about the crimes that they have committed. This communication can come in many forms including text messages and voice calls. Furthermore I know from previous investigations that gang members / criminals will commonly take photographs of themselves and/or their associates in possession of firearms. These photographs are commonly taken with cell phones. Gang members / criminals will often pose for photographs in an effort to boast to their associates about the type of weapons they possess and weapons they are willing to sell. They also pose for these photographs to gain additional status, notoriety and respect within their own group of associates.

Based on your Affiant's training and experience I also know that female associates of gang members are known to conceal firearms, narcotics and other evidence at their residences to assist

Based on your Affiant's training and experience I believe that the clothing worn by the suspects at the time of the shooting will still be present because perpetrators of crimes do not think to dispose of such item. They do not realize the value of circumstantial evidence in proving they committed the alleged crime.

1 | their male counterparts. Your Affiant knows from his training and experience that gang members who

2 | are subject to probation/parole searches hide contraband items, such as narcotics, weaponry, and

3 | stolen property at locations other than their probation address including the residences of girlfriends.

4 |      Based upon your Affiant's training and experience I know that during the service of this search

5 | warrant there are many articles of personal and/or business property tending to establish the identity

6 | of person who have dominion and control over the premises, business, vehicles and/or items to be

7 | seized. Your Affiant believes that these items tend to connect the premises, locations, persons, and

8 | vehicles to be searched with the items to be seized and the case being investigated. It is your

9 | Affiant's opinion that these types of items are usually present at the location sought to be searched

10 | by this search warrant and that they will therefore likely still be found in the location, and/or the

11 | persons to be searched.

12 |      Your Affiant's experience has also shown that individuals arrive at the scene of a search

13 | warrant while officers are there serving their warrant. Your Affiant's investigative experience has

14 | shown that many of these individuals are in possession of articles (keys, rent receipts, etc.) that tend

15 | to prove that they are occupants of the location being searched. Additionally, many of the

16 | individuals are found to be in possession of weapons and are wanted by authorities for charges

17 | unrelated to this investigation.

18 |      Therefore, based on my training, experience, and the above facts, I believe I have probable

19 | cause to believe the above-described property or a portion thereof will be at the location

20 | described in Attachment "A" when the warrant is served. I request this search warrant be issued

21 | based upon the above facts for the seizure / recovery of outstanding firearms, to prevent the

22 | destruction of evidence, to locate additional evidence, and to identify the perpetrator.

23 |      I respectfully request this search warrant be issued based upon the above facts for the seizure

24 | of said property, or any part thereof, during the daytime, good cause being shown therefore.

25 |      I declare under penalty of perjury of the law of the state of California that the foregoing is true

26 | and correct to the best of my ability.

Warrant ID: 0000094

EXHIBIT
D

Supplement - Case: 18-020799

Event: 18-AN0177

On 5-8-18 I responded to Fresno Police Property and Evidence and retrieved the FN handgun we had recovered from the trunk of the silver Dodge Charger. I also obtained two live rounds of 9mm ammunition for test firing. I took the firearm and ammunition to the testing site and fired two rounds from the handgun. I placed the spent cartridge casings into a department envelope and booked the casings into evidence. I then returned the handgun to property and evidence.

On 5-9-18 I contacted Edwards via telephone to release her silver Dodge Charger to her. I arranged to release the vehicle to her the following day. I asked her about the handgun I had found and Edwards claimed not to know anything about it. She said she gives rides to clients for work but they do not put their belongings in the trunk. (My conversation with her was audio recorded).

On 5-10-18 I responded to the Fresno County Jail and added charges to Garrett for this shooting. I also contacted Faytock via telephone. He told me he does not know Garrett and Garrett does not have permission to have his cell phone or handgun. He said he did have a cell phone stolen during theft and he had turned in a property form to Fresno Police Department with that information listed. He said he also had boxes of ammunition stolen.

I checked the stolen vehicle report and confirmed that he had submitted a list of property stolen. This list included a black Motorola Razor Max HD serial ███████████ This serial number matched the IMEI number on the cell phone recovered.

On 5-11-18 I submitted the request form to the California Department of Justice to have the FN handgun we recovered compared to the expended cartridge case found at the scene.

**CONCLUSIONS/DEDUCTIONS:**

Suspect Charles Garrett was identified as the shooter in this case. He was found to be in custody on an unrelated gun charge and I responded to the jail where I arrested him for this shooting.

During a search warrant service a 9mm handgun with two high capacity magazines were located inside the suspect vehicle. A search warrant was also authorized to search the two cell phones Garrett was in possession of at the time of his arrest. One of those cell phones was found to belong to the victim whose firearm Garrett was previously arrested for.

**DISPOSITION:**

1.) Suspect Charles Garrett arrested for PC 245(a)(2) - assault with a firearm, PC 29800(a)(1) - possession of a firearm by a felon, PC 30305(a) - possession of ammunition by a felon, and PC 32310 - possession of a large capacity magazine.

2.) Felicia Edwards provided a PC 849(b) form and released from Police HQ.

3.) Edwards and Garrett provided with notice of an electronic search warrant forms

4.) Search warrant notices, a copy of the search warrant and receipt of seized property left at ████ ████████████████████████████████

Officer: MENDES (V3161), JOHN #P1413                                      Page 14 of 15
Supervisor: MENDES (V3161), JOHN #P1413

Supplement - Case: 18-020799

**Event: 18-AN0177**

5.) Firearm and other evidence booked as evidence. Firearm submitted to California DOJ for ballistic comparison testing.

6.) Silver Dodge Charger impounded as evidence and then released to Edwards. Property receipt left inside vehicle.

7.) Photographs attached to this report.

8.) Screenshots from the Sierra Inn video attached to this report.

9.) See Fresno Police case 18-21273 for Garrett's gun arrest.

10.)    See Fresno Police case 18-20852 for the stolen Cadillac investigation.

11.)    See Fresno Police case 18-14702 for the stolen GMC Denali investigation.

12.)    Child Protective Services was notified of the child being in the vehicle and Edwards' job position.

13.)    I've been unable to contact possible witness Girard Jackson.

---

**RELATED REPORTS**

CASE PD:18021273  Comment:

---

EXHIBIT
E

1                    MORNING SESSION - MAY 31, 2018

2               (The following proceedings were had in open

3               court in the presence of the Court, Counsel,

4               and the Defendant:)

5          THE COURT:  Let's call the case of Charles Devon Garrett.

6     The prelim case is F18902214, and the other cases are

7     F18903146, a pre prelim which I believe the Public Defender's

8     going to stand in for Ciummo and Associates.

9          MR. LINDAHL:  I was authorized to stand in for Ciummo on

10    the trailing matter.

11         THE COURT:  Oh.  That may have changed since 15,

12    20 minutes ago, but anyway the sentencing is PD, correct?

13         MS. CHUNG:  That's correct.  Jane Chung appearing for

14    Deidre Adams on case ending in 972.

15         THE COURT:  All right.  With regard to the preliminary

16    hearing, are all parties ready to proceed?

17         MR. LINDAHL:  Yes.

18         MR. WALTERS:  Yes.

19         THE COURT:  Any motions before we start evidence?

20         MR. LINDAHL:  Move to exclude witnesses.

21         I'd ask that my client's writing hand be unshackled so he

22    can take notes and assist in his defense.

23         THE COURT:  That sounds like a fair request.

24         Any other motions?

25         MR. WALTERS:  Yes.  People move to admit Exhibit 4.  It

26    is a nine-page certified CLETS showing the felony offense

1   enumerated for Counts 1 and 2.  May I approach?

2        THE COURT:  Yes.

3        Any objection?

4        MR. LINDAHL:  Can't think of one.

5        THE COURT:  Neither can I, so that's admitted.

6        MR. WALTERS:  With that, People call Sergeant Zebulon

7   Price.

8        THE COURT:  All right.  Sergeant price.

9        All right, Sergeant, will you step up here to take the

10   oath.

11                          -oOo-

12                     **ZEBULON PRICE**

13        THE COURT:  Have a seat, make yourself comfortable.

14   Speak into the microphone.  And let us know when you're ready.

15        THE WITNESS:  How are you?

16        THE COURT:  Good.  Are you ready?

17        THE WITNESS:  Yes, sir.

18        THE COURT:  All right.  Will you please state your full

19   name and spell your last name?

20        THE WITNESS:  I'll have to spell both.  My name is

21   Zebulon Price.  That's Z-E-B-U-L-O-N.  And Price, P-R-I-C-E.

22        THE COURT:  All right.  Counsel?

23        MR. WALTERS:  Thank you.

24   ///

25   ///

26   ///

DIRECT EXAMINATION

BY MR. WALTERS:

    Q    Sergeant Price, what is your occupation and assignment?

    A    I'm currently a patrol sergeant with the southwest policing district.  I'm a sworn sergeant with the Fresno Police Department.

    Q    How long have you been a police officer?

    A    I've been a police officer for 15 years.

    Q    Were you working in your capacity as a police officer on March 29th, 2018, at approximately 2100 hours, which is --

    A    9 o'clock.

    Q    9 o'clock.

    A    p.m.  Yes, sir.

    Q    And on that date and time, were you dispatched to a location at 2255 South Plumas Avenue?

    A    Yes, I was.

    Q    Is that in the County of Fresno?

    A    City and county, yes, sir.

    Q    Do you recognize anybody in the courtroom today from that date, time and location?

    A    I do.

    Q    Can you please point to that person and describe an article of clothing he or she is wearing?

    A    It is this gentleman to my left that I saw walking

1  in wearing the red jumpsuit.

2       THE COURT:  Seated at the counsel table?

3       THE WITNESS:  Yes.

4       THE COURT:  All right.  For the record he's indicated the

5  defendant in this case as Charles Devon Garrett.

6       MR. WALTERS:  Q.   Why were you dispatched to that

7  location?

8       A    We received a 911 call that there was a subject

9  outside of apartment number -- I believe it was 225 or -- if I

10 remember correctly -- with a firearm.

11      Q    And did you subsequently arrive at that location?

12      A    I did.

13      Q    What did you do when you got there?

14      A    I pulled into the apartment complex with other

15 officers.  I then observed three -- what appeared to be three

16 males, dark-complected males, in the parking lot.  Two of the

17 individuals were wearing a red shirt and the other one was

18 wearing a darker colored shirt.

19      Q    And what did you do next?

20      A    As I drove into the apartment complex, two of the

21 individuals made their way up a staircase to the apartment

22 that was identified in the call.

23      Q    Was defendant Garrett one of those?

24      A    Yes, he was.

25      Q    And what happened after that?

26      A    Well, the call for service update in the call said

1    that the subject with a firearm was a black male wearing a red

2    shirt and gold teeth.

3        Q    Did Mr. Garrett have gold teeth?

4        A    Yes.  He had gold a grill, for lack of a better

5    term.  It's just a faux insert that you place over your teeth

6    for show and for fashion.  It's a gold plated article of

7    jewelry.

8        Q    Did you follow Mr. Garrett?

9        A    I watched Mr. Garrett go up the staircase to the

10   apartment.  He then went on to the landing in front of the

11   front door of the apartment, and I watched him from the

12   ground.  I watched him as he went up the stairs and then made

13   his way towards the landing area to the corner.  He then stood

14   there for a little bit, at which time I then made my way up

15   the stairs and he was detained.

16       Q    What did you do once you made it up to the stairs?

17       A    Once Mr. Garrett and the other individual were

18   detained, I made my way to where I observed him walk.  Just

19   based on the last 15 years of experience I had a pretty good

20   assumption that something was probably --

21       MR. LINDAHL:  Objection.  Nonresponsive.

22       THE WITNESS:  -- discarded.

23       THE COURT:  Sustained.

24       MR. WALTERS:  Q.  Let me back up.  When you were up at

25   the top of the stairs, did you speak with anybody?

26       A    Yes, I did.

1     Q    Who did you speak to?

2     A    There was a group of females, African-American

3  females, that were standing on the landing.

4     Q    And why did you speak to that group of females?

5     A    I went to the landing and I found a bag of meth or

6  white crystalline substance in a plastic baggie which, based

7  on my training and experience, I believed was crystal

8  methamphetamine.  After finding it where there was an old tube

9  TV and a pair of white tennis shoes, I asked to speak to the

10  person who was renting the unit.

11     Q    And when you did this, was Mr. Garrett nearby at

12  all?

13     A    Yes, he was.

14     Q    And approximately how far away was he from the group

15  of females?

16     MR. LINDAHL:  Objection.  Vague as to time.

17     THE COURT:  Is this when you went up the landing?

18     THE WITNESS:  Yes, sir.

19     MR. LINDAHL:  Withdrawn.

20     THE COURT:  Overruled.

21     THE WITNESS:  He was about ten yards away.  No more than

22  ten yards away from the landing to the front door of the

23  apartment.

24     MR. WALTERS:  Q.  And did you speak -- did you speak to

25  any of those females specifically regarding Mr. Garrett?

26     A    I did.

1      Q    And what did they tell you?

2      MR. LINDAHL:  Object to the form of the question as

3   compound.  "They."

4      MR. WALTERS:  I'll rephrase.

5      THE COURT:  Thank you.

6      MR. WALTERS:  Q.   Did you speak to an individual -- a

7   black female up on the landing regarding defendant Garrett?

8      A    I did.

9      Q    Do you know who that female was?

10     A    She was later identified.  I do not know who she is.

11     Q    Okay.  What did she tell you regarding defendant

12  Garrett?

13     A    I showed her the bag of what I believed to be

14  methamphetamine.  She stated that she believed Mr. Garrett had

15  put it there.  While I was speaking with her, she then said

16  she also observed him with a firearm, told me that the firearm

17  was placed on a back tire of a brown Buick that was in the

18  parking lot.  She then -- well, she said "scraper" which I

19  know to be a -- you know, a sedan type vehicle with large

20  rims.  And that was the only vehicle in the parking lot that

21  matched that description was the brown scraper, Buick.

22     MR. WALTERS:  And, Your Honor, may I approach?

23     THE COURT:  Sure.

24     MR. WALTERS:  Q.   Sergeant, I'm approaching you with

25  what's been marked as People's 2 for identification.  Do you

26  recognize what's depicted in People's 2?

1        A      Yes.

2        Q      What is that?

3        A      This is the brown Buick sedan that the female in the

4   apartment was identifying.

5        Q      And is that a true and accurate photograph of how it

6   looked to you on or about March 29th, 2018?

7        A      Yes, sir.

8        Q      Approaching you with what's been marked as Exhibit 3

9   for identification.  Do you recognize what's depicted in

10  Exhibit 3?

11       A      Yes, I do.

12       Q      What's that?

13       A      This is the back driver's side quarter panel of the

14  Buick.  Of the scraper.

15       Q      Same car as in People's 2?

16       A      Yes, sir.

17       Q      And is that how it looked to you on your arrival

18  March 29th, 2018?

19       A      Yes.

20       MR. WALTERS:  Move People's 2 and 3 into evidence.

21       MR. LINDAHL:  No objection.

22       THE COURT:  Admitted.

23       MR. WALTERS:  Q.  Did you search around that vehicle?

24       A      Yes, I did.

25       Q      Did you find anything?

26       A      I did.

1        Q      What did you find?

2        A      I found a black semiautomatic handgun.

3        Q      Approaching with what's been marked as People's 1

4    for identification.  Do you recognize what's depicted in

5    People's 1?

6        A      I do.

7        Q      What's that?

8        A      This is the semiautomatic handgun I found sitting on

9    top of the tire.  It was in the wheel well on top of the tire.

10       Q      And is that a true and accurate photograph of the

11   firearm that you found on the wheel well of that brown Buick

12   sedan?

13       A      Yes, sir.

14   MR. WALTERS:  People move Exhibit 1 into evidence.

15   MR. LINDAHL:  No objection.

16   THE COURT:  Admitted.

17   MR. WALTERS:  Q.  When you found that firearm, can you

18   describe in what condition you found it?

19       A      It was -- the firearm was sitting on top of the

20   wheel well.  There was a magazine inside the firearm.

21       Q      Did you check to see whether or not that firearm was

22   loaded?

23       A      No, sir, I did not.

24       Q      Did somebody at some point?

25       A      Yes.

26       Q      Do you know who?

1      A    Yes.

2      Q    Who?

3      A    I motioned to Officer Vincent Baez to come over who

4    had a pair of gloves who then retrieved the firearm and

5    unloaded it.  There were bullets in the magazine.  I do not

6    remember if there was one in the chamber.

7      MR. WALTERS:  May I have just a moment?

8      THE COURT:  Sure.

9      MR. WALTERS:  Nothing further for this witness.

10     THE COURT:  Cross?

11     MR. LINDAHL:  Yes.

12                       **CROSS-EXAMINATION**

13   **BY MR. LINDAHL:**

14     Q    Sergeant Price, when you responded on this case, you

15   were receiving information from Dispatch, correct?

16     A    Yes.

17     Q    And was there -- with regard to who was identified,

18   did Dispatch identify three males?

19     A    Was that a question, sir?

20     Q    It was a question.  Did Dispatch identify three

21   males?

22     A    Did Dispatch?

23     Q    Yes.

24     A    Dispatch said there was three males.

25     Q    So that's a "yes"?

26     A    Well, identification is identification, right?

1    There was no names specific.  It was just three males.

2        MR. LINDAHL:  Objection.  Nonresponsive.

3    .    THE COURT:  He's explaining his answer.

4        MR. LINDAHL:  Q.  Okay.  When you listened to Dispatch,

5    didn't you hear a description of a male with a red shirt and

6    dreadlocks as being the individual with the firearm?

7        A    Yes.

8        Q    Did Mr. Garrett have dreadlocks?

9        A    No.

10        Q    Okay.  And your observation of Mr. Garrett was as he

11    made his way up a set of stairs; is that right?

12        A    That was part of my observation, yes.

13        Q    All right.  And the females that you testified you

14    spoke to -- actually, we've narrowed it down to one.  You

15    spoke to a female and you did not know who she was, correct?

16        A    Correct.

17        Q    All right.  And she told you that she believed the

18    individual she identified as Garrett placed a gun downstairs?

19        A    No, not at all.  I did not say that.

20        Q    Didn't you just testify to that?

21        A    No, sir, I did not.  I said she believed he had the

22    methamphetamine.

23        Q    Okay.

24        A    Not the firearm.  She specifically said that she

25    observed him place the firearm on top of the tire of where the

26    gas cap is --

1      Q      Okay.

2      A      -- which is the back passenger -- I'm sorry, the

3    back driver's side tire which is exactly where I went and

4    found the firearm.

5      Q      So her statement to you was that she knew Garrett

6    put the gun there, but she believed he put the methamphetamine

7    there?

8      A      Yes.

9      Q      Is that right?

10     A      Because she did not see him place the

11   methamphetamine there, but she did see him --

12     Q      You don't have to explain.

13     A      Well, it seemed like you needed some clarification

14   so I'm just helping, sir.

15     Q      No.  I'm crystal clear.

16     A      Outstanding.

17     Q      Now, did she tell you anything else she believed?

18   Did she believe Tupac's still alive?  Did you ask her anything

19   like that?

20     MR. WALTERS:  Objection.  Argumentative, relevance.

21     THE COURT:  Sustained.

22     MR. LINDAHL:  You don't have to answer that.

23     THE COURT:  But for the record, Tupac is dead, isn't he?

24     THE WITNESS:  I believe so.

25     MR. LINDAHL:  For the record, yes.

26     Q      Did you find anything else unusual at the vehicle

1     you referred to as the scraper?

2          A     No.

3          Q     Okay.  Sergeant Price, did you find any other, I'll

4     say, loose objects near where the firearm was located?

5          A     Sitting on top of the tire, sir?

6          Q     Or if not sitting on top of the tire, sitting in

7     close proximity, like, within arm's reach of that tire?

8          A     No, I did not.

9          Q     Did you notice a set of keys on the fender or on top

10    of the vehicle?

11         A     No.

12         Q     Did you notice a cell phone on top of the vehicle --

13    on top of the wheel well there?

14         A     No.

15         Q     Okay.  And if you recall, what color clothing was

16    Mr. Garrett wearing?

17         A     He had on a pair of jeans.  I don't know what color.

18    They were dark in color.  He had on a red shirt, and I believe

19    that was it.  And a gold grill.

20         MR. LINDAHL:  Thank you.  That's all I have.

21         THE COURT:  Any redirect?

22         MR. WALTERS:  Yes.

23                         **REDIRECT EXAMINATION**

24    BY MR. WALTERS:

25         Q     Did you see anybody else on the scene with a gold

26    grill?

1      A    No, sir.

2      MR. WALTERS:  Nothing further.

3                    RECROSS-EXAMINATION

4  BY MR. LINDAHL:

5      Q    Did you see anybody on the scene with dreadlocks?

6      MR. LINDAHL:  No, sir.

7      THE COURT:  All right.  Are we concluded with this

8  witness for the time being?

9      MR. WALTERS:  Yes.

10     MR. LINDAHL:  Yes, for now.

11     THE COURT:  All right, sir, you're excused.  You can

12 either remain here as the chief investigating officer or wait

13 outside.

14     THE WITNESS:  Yes, sir.  Thank you.

15     THE COURT:  Thank you.

16     MR. WALTERS:  People call Officer Pablo Rivera.

17     THE COURT:  All right, Officer, will you please step up

18 here?  They're going to take your oath.

19                          -oOo-

20                       PABLO RIVERA

21           called, sworn and testified as follows:

22     THE COURT:  Thank you.  Have a seat.  Make yourself

23 comfortable.  Scoot up to the microphone and let me know when

24 you're ready.

25     THE WITNESS:  Ready.

26     THE COURT:  Okay.  Would you please state your full name

1   for the record and spell your last name?

2          THE WITNESS:  Pablo Antonio Rivera, R-I-V-E-R-A.

3          THE COURT:  Thank you.

4   Counsel?

5          MR. WALTERS:  Thank you.

6                      **DIRECT EXAMINATION**

7   **BY MR. WALTERS:**

8          Q    Officer Rivera, what do you do for a living?

9          A    Police officer for Fresno Police Department.

10         Q    And how long have you been a police officer?

11         A    Approximately five months.

12         Q    Have you taken any Peace Officer Standards and

13  Training courses instructing you on testifying at preliminary

14  hearings specifically pursuant to Proposition 115?

15         A    Yes.

16         Q    Did you pass that class?

17         A    Yes.

18         Q    Were you working in your capacity as a police

19  officer on March 29th, 2018, at 2110 hours?

20         A    Yes.

21         Q    And on that date and time, were you dispatched to a

22  location 2255 South Plumas Avenue?

23         A    Yes.

24         Q    Is that in the County of Fresno?

25         A    Yes.

26         Q    Why were you dispatched there?

1      A      Regarding a disturbance.

2      Q      Did you subsequently arrive at that location?

3      A      Yes.

4      Q      Did you have an opportunity to speak to an

5      individual by the name of Malika, M-A-L-I-K-A, Senegal,

6      S-E-N-E-G-A-L?

7      A      Yes.

8      Q      Why did you speak to her?

9      A      She was the one willing to speak and she said she

10     called us.

11     Q      Okay.  And when you spoke with her, did you -- was

12     there any break in the interview with her?

13     A      Yes.

14     Q      So let's talk about the first time you spoke with

15     Ms. Senegal.  What did Ms. Senegal tell you about the

16     disturbance the first time you spoke with her?

17     A      The first time we spoke, she just said that she had

18     problems with her ex-boyfriend -- or her boyfriend, that two

19     subjects came to contact them to settle a beef.  She was

20     hesitant to point out the suspects.  She said that they took

21     off and she described a BMW or a Mercedes SUV.

22     Q      And do you know somebody by the name of Charles

23     Garrett?

24     A      Yes.

25     Q      Do you see him in the courtroom today?

26     A      Yes.

1          Q     Can you point to him and describe an article of

2     clothing he's wearing?

3          A     Red shirt.

4          THE COURT:   I'll indicate for the record that he's

5     identified Charles Garrett as the person he's just made a

6     statement about.

7          MR. WALTERS:   Q.   When you first spoke with Ms. Senegal,

8     was Mr. Garrett anywhere in the vicinity?

9          A     Yes.

10         Q     Approximately how far away, if you remember?

11         A     25 to 30 feet.

12         Q     And you said that there was a break in the interview

13    with Ms. Senegal; what happened in the middle of that break?

14         A     Well, in the middle of the break the suspect

15    S-Garrett tried to walk off.   He was detained, and she went

16    back up to the landing by the apartment.   Then she decided to

17    talk again.

18         Q     Okay.   And the second time was Mr. Garrett in the

19    area?

20         A     No.

21         Q     What did she tell you during the second part of the

22    interview?

23         A     During the second time of the interview she said

24    that that was him.   She said he's the one who was with the

25    gun.   He had it in his waistband.   "He brandished it to my

26    brother," describing him.

1      Q    Did she tell you whether or not Mr. Garrett made any

2   statement to her brother?

3      A    Yes.

4      Q    What did she say?

5      MR. LINDAHL:  I'm going to have to object to that as

6   calling for multiple layers of hearsay.

7      MR. WALTERS:  May I be heard?

8      THE COURT:  Not what she said.

9   Go ahead.  Overruled.

10      THE WITNESS:  Can I refer to my report?

11      MR. WALTERS:  If that would help you refresh your

12   recollection, with the Court's permission.

13      THE COURT:  Sure.

14      THE WITNESS:  Yes.

15      MR. WALTERS:  Direct you to page five of six of your

16   report, first paragraph.

17      THE WITNESS:  (Witness reviews report.)

18      MR. WALTERS:  Q.   Has your recollection been refreshed?

19      A    Yes.

20      Q    What if anything did Ms. Senegal say that Garrett

21   said during this disturbance?

22      A    "I'm going to flat line your ass."

23      Q    Did you ask her what she thought that meant?

24      A    It meant to kill.

25      Q    And did she tell you what Mr. Garrett was doing as

26   he made that statement?

1    A    He was brandishing his weapon in his waistband.

2    Q    Did she tell you whether or not Mr. Garrett made any

3    other statements that day?

4    A    Yes.

5    Q    And what was that?

6    A    "This is Strother.  I'm not running from anybody."

7    Q    Did she tell you what she -- what happened with the

8    gun and Mr. Garrett?

9    A    Yes.

10    Q    What did she say?

11    A    That he walked down the stairwell.  He walked to the

12    rear tire of the car that was parked in front of the apartment

13    and he placed the gun on top of the right -- sorry, the left

14    rear tire of the sedan.

15    MR. WALTERS:  Thank you.  I have nothing further.

16    THE COURT:  Cross-examination?

17                    **CROSS-EXAMINATION**

18    **BY MR. LINDAHL:**

19    Q    Officer Rivera, so you spoke with Ms. Senegal two

20    times?

21    A    Yes.

22    Q    And the first time you spoke with her, was -- did

23    she not identify anyone with a weapon?

24    A    No.

25    Q    So she did identify someone with a weapon?

26    A    Yes.

```
 1        Q    Was that Mr. Newsom?

 2        A    Yes.

 3        Q    Okay.  Just so we're clear, the gentleman seated

 4   here next to me is not Mr. Newsom, correct?

 5        A    Correct.

 6        Q    All right.  Then when you spoke with Ms. Senegal,

 7   did she -- were you questioning her about some methamphetamine

 8   that had been found close to her?

 9        A    No.

10        Q    All right.  When you first spoke to Ms. Senegal, how

11   long was this conversation?

12        A    Five, six minutes.

13        Q    All right.  And during that first conversation,

14   Ms. Senegal did not identify Mr. Garrett as anyone with a

15   weapon, correct?

16        A    Correct.

17        Q    All right.  Now, you mentioned that at some point

18   Mr. Garrett was trying to walk away?

19        A    Yes.

20        Q    Now, were you still with Ms. Senegal when

21   Mr. Garrett attempted to walk away?

22        A    Yes.

23        Q    Did you witness this with your own eyes?

24        A    Yes.

25        Q    And how far from you, if you can estimate or if you

26   know, was Mr. Garrett from you when he began to walk away?
```

1      A    He was already at the parking space.  I want to say

2   40, 45, 50 feet.

3      Q    Now, the apartment -- strike that.

4   Were you speaking to Ms. Senegal indoors or outdoors?

5      A    Outdoor.

6      Q    And was this on the apartment landing?

7      A    No.

8      Q    Where was it?

9      A    It was in the -- it was at the ground level of the

10  apartment on the sidewalk.

11     Q    And what time of day or night was this?

12     A    At this time it was 2130 approximately.

13     Q    2130, so that would be 9:30?

14     A    Correct.

15     Q    p.m.?

16     A    Correct.

17     Q    This is kind of a duh question, but was it dark?

18     A    Yes.

19     Q    Okay.  And if you recall, what time were you called

20  out on this original disturbance call?

21     A    Approximately 2100.

22     Q    All right.  So -- or 9:00 p.m. roughly, correct?

23     A    Yes.

24     Q    And it was dark then?

25     A    Yes.

26     Q    Okay.  And this disturbance took place at an

1    apartment complex?

2         A    Yes.

3         Q    All right.  And the parking area, were there parking

4    stalls?

5         A    Yes.

6         Q    Were they covered or were they open air?

7         A    I don't remember.

8         Q    Okay.  Do you recall if they were lit with some sort

9    of lighting?

10        A    Yes.

11        Q    What sort of lighting, if any, were they lit with?

12        A    If anything there was lamp post.

13        Q    If anything?

14        A    Yes.

15        Q    You sound uncertain.

16        A    I'm uncertain.

17        Q    Okay.  Now, during the initial -- the first

18   interview with Ms. Senegal, did Ms. Senegal tell you that the

19   people causing the disturbance had left in two vehicles?

20        A    She said that two people left but she was unsure

21   which kind of car it was.

22        Q    All right.  Now, you've testified about a Mercedes

23   SUV and a BMW?

24        A    Yes.

25        Q    Did she tell you that people left in both a Mercedes

26   and a BMW or was she not certain?

1        A    She was not certain.

2        Q    Okay.  Did you ask any follow-up to clarify what she

3    thought she knew about the people leaving in this vehicle or

4    vehicles?

5        A    No.

6        Q    Was she able to tell you how many people she thought

7    left in this vehicle or vehicles?

8        A    Yes.

9        Q    How many?

10       A    Two.

11       Q    All right.  Did you speak with Mr. Garrett?

12       A    No.

13       Q    All right.  Did Mr. Garrett appear to you to be

14   cooperative with any commands given by the officers to remain

15   on the scene?

16       A    Yes.

17       Q    While you were -- while you had Mr. Garrett in view,

18   did he appear -- was he holding a cell phone?

19       A    I don't recall.

20       Q    Do you recall if it appeared that Mr. Garrett was

21   recording any of the investigation that was going on at that

22   time?

23       A    No, I don't recall.

24       Q    Did you personally search Mr. Garrett in this case?

25       A    No.

26       MR. LINDAHL:  That's all I have.

1    THE COURT:  Any redirect?

2    MR. WALTERS:  Briefly.

3                        **REDIRECT EXAMINATION**

4    **BY MR. WALTERS:**

5    Q    The apartment complex that you went to, could you

6    just drive in or was there anything blocking your ability to

7    get to where the carports were?

8    A    You can just drive in.

9    MR. WALTERS:  Thank you.  Nothing further.

10    THE COURT:  Any recross?

11    MR. LINDAHL:  No.

12    THE COURT:  All right.  Thank you, Officer.  Why don't

13    you wait outside until the evidence is concluded.

14    THE WITNESS:  Yes, sir.

15    MR. WALTERS:  The People have no further evidence.

16    THE COURT:  The People resting, does the defense have any

17    evidence?

18    MR. LINDAHL:  I'm sorry, Your Honor?

19    THE COURT:  Does the defense have any evidence?

20    MR. LINDAHL:  We will not be putting on any evidence at

21    this hearing, Your Honor.

22    THE COURT:  All right.  So both sides having rested, does

23    the prosecutor have any motion?

24    MR. WALTERS:  Yes.  Hold Mr. Garrett to all counts

25    alleged.

26    THE COURT:  And does the defense want to respond?

1       MR. LINDAHL:  Only that I find -- well, I guess the Court

2   can find Count 3 should it so choose.  It's a probable cause

3   hearing.  Submitted.

4       THE COURT:  All right.  The Court determines that the

5   offenses in the Complaint have been committed and there is

6   sufficient cause to believe the named defendant is guilty

7   thereof.  I order that he be held to answer to the same.

8       The arraignment in this matter, assuming an Information

9   is filed, is scheduled for June 15, 2018, at 8:30 a.m.

10      And bail remains the same at this point.

11      Now we have Mr. Garrett's two other cases.  One of them

12  is a sentencing.  Public defender represents him on that.

13      MS. CHUNG:  That's correct, Your Honor.  Jane Chung on

14  his behalf.  Deidre Adams is presently on vacation.  She'll

15  return on Monday.  I'd ask that the status of sentencing just

16  continue for the next hearing.  Maybe we can address it then.

17      THE COURT:  Is that agreeable, Mr. Garrett?

18      THE DEFENDANT:  Yes, sir.

19      THE COURT:  All right.  And also there is a pre

20  preliminary hearing for Mr. Garrett.  You want to continue

21  that with an open general time waiver to that same date?

22      MR. LINDAHL:  Your Honor, I spoke with Mr. Alvarez of the

23  Ciummo office and his request, and mine as well, is that this

24  matter trail with a general time waiver behind my HTA

25  arraignment, same date.

26      THE COURT:  Is that correct, Mr. Garrett, and do you

1    agree to that?

2         THE DEFENDANT:  Yes, sir.

3         THE COURT:  All right.  Then all matters will be on the

4    15th at 8:30 a.m. for their respective status.

5         MR. WALTERS:  And, Your Honor, I did provide

6    approximately 108 gigabytes of discovery on case ending 3146

7    to Ciummo and Associates today.

8         THE COURT:  Noted.

9         MR. WALTERS:  Thank you.

10        (Matter concluded.)

11                            -oOo-

12        (Volume 1 consists of Pages 1 through 50.

13         There are no Pages 51 through 300.  Volume 2

14         will start on Page 301.)

15                            -oOo-

16

17

18

19

20

21

22

23

24

25

26

1    STATE OF CALIFORNIA    )
                             ) ss.
2    COUNTY OF FRESNO        )

3    I, STACY K. OBEL-JORGENSEN, Official Shorthand Reporter, do

4    hereby certify and declare that I was the duly appointed and

5    acting Official Stenographic Reporter for the Superior Court

6    of the State of California, County of Fresno, on the hearing

7    of the foregoing matter held February 8, April 19, May 9, May

8    23, May 29 and May 31, 2018; that the foregoing is a complete,

9    true and correct transcription of the stenographic notes as

10   taken by me in said matter on said date consisting of pages 1

11   through 50.

12        Dated August 13, 2019.

13

14

15

16

17                            _____
                              STACY K. OBEL-JORGENSEN, CSR, RPR
18                            Certificate No. 11988

19

20

21

22

23

24

25

26

EXHIBIT
F

1       A.   I did.

2       Q.   **What is your background, training and experience as**

3   **it relates to reading cell phone records?**

4       A.   I happen to do a 16 hour class on cell phone data

5   investigations and we went over plotting cell phones and cell

6   phone -- cell phones and how they work, and how they

7   communicate with cell phone towers and I've done it numerous

8   times for dozens of phones.

9       Q.   **Okay.  And did you receive the records for**

10  **Felicia's cell phone for on or about March 27?**

11      A.   Yes.

12      Q.   **And at the time the shooting occurred, were you**

13  **able to tell, generally speaking, what vicinity she was in?**

14      A.   Her cell phone connected with the tower at 959

15  North Parkway, which is one -- which would be one hotel north

16  of the Sierra Inn.

17      Q.   **How did -- well, let me back up.**

18  **So you authored a search warrant did, you actually have**

19  **the physical cell phone or was it just for records?**

20      A.   Just for records.

21      Q.   **How did you come across her number?**

22      A.   That is -- it was the phone number that she had

23  provided to the police when she reported the car stolen. I

24  also had gotten the number from watching body camera video

25  when Mr. Garrett was arrested on March 29 and he asked the

26  officers to call her, and he provides that phone number to

1      Q.   Why did you do that?

2      A.   Her phone was pinging, or her phone was showing in

3  the area of Madera, so we drove over there.  We identified an

4  address where she was working at a group home and we drove by

5  the group home and saw a silver Dodge Charger that matched

6  the Charger that I saw on the video parked around the corner

7  from the group home.

8      Q.   Okay.  Did you run that Charger to see who it was

9  registered to?

10     A.   I did.  It was registered to Felicia's father

11 Ronald Edwards.

12     Q.   Okay.  Now, you said something about Felicia's cell

13 phone pinging and it pinged in Madera, how did you get that

14 information?

15     A.   I got the information as far as where her phone was

16 showing as a result of the search warrant, I served the

17 search warrant on her cell phone provider, which I believe

18 was T-Mobile.  So they started providing me with every 15

19 minutes they send me an e-mail with a location of the cell

20 phone if it's turned on with an accuracy of, it varies, it

21 could be anywhere from three meters to thousands of meters.

22     Q.   Did that search warrant also cover the date of this

23 incident?

24     A.   Yes.  It also asked for call detail records for the

25 day of the shooting, which was March 27.

26     Q.   Okay.  Did you receive those records?

1    the officers on that occasion as well.

2        Q.    I'm approaching with what has been marked as

3    People's 8 and 9, do you recognize the vehicle depicted in

4    People's 8?

5        A.    Yes, I do.

6        Q.    And how do you recognize that vehicle?

7        A.    That is the vehicle that we eventually arrested

8    Ms. Edwards in, the silver Dodge Charger.  This picture was

9    taken at Fortney towing, the vehicle in the surveillance

10   video at the Sierra Inn.

11       Q.    Was that photograph taken on or about May 7 of

12   2018?

13       A.    Correct.

14       Q.    Is that when a subsequent search of that

15   happened -- search of that vehicle happened related to this

16   case?

17       A.    Yes.

18       Q.    We'll get to that.  The second photograph, People's

19   9, do you recognize the vehicle in that -- do you recognize

20   what is depicted in that photograph?

21       A.    Correct.  That is the back window of the vehicle

22   with the -- with the rear sticker on the back window, it's a

23   First Calvary sticker of the Army.

24       Q.    Okay.  And you said that you recognize that Charger

25   in People's 8 and 9 as being the Charger that you saw in the

26   surveillance video, why do you say that?

1    A.   It's the same car.  They're both Dodge Chargers,

2   appear to be the same color, silver, the same five spoke

3   wheels on the car and also the sticker on the back window.

4    Q.   I'm approaching you with what has been admitted as

5   People's 3 already.

6    Mr. Asami, if you want to come up here briefly.

7    In People's 3 could you point out the similar attributes

8   of the vehicle in People's 8 and 9 to the vehicle in People's

9   3?

10   A.   Well, the shape of the car, they're both Dodge

11  Chargers, you can see the wheels on the car have the five

12  spokes of the same color, almost the same color of the car

13  itself, and then also the First Calvary sticker in the center

14  of the back window here.  Then you can tell there is a --

15  there is -- there is something in the center of the back

16  window right here, you can't tell it's that sticker for sure,

17  but you can definitely tell there is something there.

18   Q.   Okay.  So you were able to surveil that Charger in

19  Madera.  What did you do next in your investigation?

20   A.   After doing that I continued following Ms. Edwards

21  location of her phone and I saw that it appeared that she had

22  been staying at 2331 North Prospect.

23   Q.   Did you author a search warrant for that location?

24   A.   I did.

25   Q.   And did you execute that search warrant?

26   A.   I did.

PEOPLE vs CHARLES DEVON GARRETT
F18903146                          August 23, 2018                          Page 61

1   is posted by Legacy iCon.  You go into the website, I have my

2   own username and password.  I log into the website at my

3   computer at my desk and I can search.  There is lots of

4   different ways I can search for jail calls.  I can search by

5   the station where the phone call is being made, I can search

6   by inmate's jail identification number, the first name, the

7   last name, or date and time calls are made, or phone numbers

8   that the calls are made to.

9       Q.   Okay.  And in this case, did you attempt to locate

10  any jail calls made by Mr. Garrett?

11      A.   Yes, I did.

12      Q.   Did you locate any jail calls by Mr. Garrett?

13      A.   I did.

14      Q.   Did you locate any jail calls -- well, throughout

15  your investigation, were you able to become familiar with

16  Mr. Garrett and Ms. Edwards' voices?

17      A.   Yeah.  By watching Mr. Garrett, by watching body

18  camera video of his prior arrest and prior contact, and then

19  also by speaking with him in person and then the same with

20  Ms. Edwards.

21      Q.   Were you able to locate any jail calls between

22  Mr. Garrett and Ms. Edwards where they talk about this case?

23      A.   Yes.

24      Q.   And specifically, what -- what did the two of

25  them -- what did you hear the two of them talk about that was

26  of significance in this case?

1    A.    There was one -- there was a jail phone visit where

2    they're talking and then it becomes very faint as if they're

3    trying to avoid their conversation being recorded by the

4    phones.  And during that you can pick up bits and pieces of

5    the conversation still and I can hear him referring to the

6    trunk, the trunk of the car, and using the term, it.

7    Referring to the -- they found it in the trunk of the car.

8        Q.    And --

9        MR. ASAMI:  I'm going to move to -- objection, move to

10   strike.  Seems to be based on speculation on what somebody

11   else is thinking.

12       THE COURT:  I'll sustain it.  Motion to strike is

13   granted.

14   BY MR. WALTERS:

15       Q.    **If I could have just a moment.**

16       **Specifically, with what you heard, what did you hear**

17   **Charles Garrett say to Felicia Edwards with respect to "it"?**

18       A.    If I may review my report to refresh my memory.

19       THE COURT:  Certainly.

20       MR. WALTERS:  Of course with the Court's permission.

21       THE COURT:  Certainly.

22   BY MR. WALTERS:

23       A.    I could hear -- I could hear Ms. Edwards say the

24   trunk, and then Mr. Garrett replies, in the trunk, and they

25   go on to say, he says, I thought I told you to put it in the

26   garage.  Ms. Edwards says, they searched the garage.  And

1          Q.   If I may have just a moment, Your Honor.  Almost

2    finished.

3          You said that you reviewed some body cam with respect to

4    Mr. Garrett's prior police contact, is that fair to say?

5          A.   Yes, sir.

6          Q.   Okay.  And how do you go about reviewing body cam?

7          A.   The officer's body camera footage is kept on a

8    website that is called evidence dot com and you can go in and

9    you can search this website.  Again, I have a log in,

10   password and log in information for the website.  You go and

11   search the website for video body camera footage that has

12   been uploaded by officers.  One of the ways you can search is

13   by case number or by officer's badge number, date and time.

14         Q.   Okay.  And did you review body cam with respect to

15   18-212733.

16         A.   That was the arrest that occurred on South Plumas,

17   yes, I did.

18         Q.   Were you able to view any video with respect to

19   Mr. Garrett speaking to officers?

20         A.   I was.

21         Q.   Did Mr. Garrett mention anything about Parkway over

22   those videos?

23         A.   He did.  He told -- he told the officers, and I'm

24   going to use language I don't normally use, Your Honor, but

25   he told -- he told the officers that he was going to get his

26   young niggas and get them on Parkway to be tripping.

EXHIBIT

G



## SUPERIOR Court of California, County of Fresno
## 1100 Van Ness Avenue, Fresno, CA 93724
## MINUTE ORDER

---

The People of the State of California vs.  **Charles Devon Garrett**                    Case Number: **F18903146**
AKAs:

| | | |
|---|---|---|
| Hearing Date: | 11/13/2018 | DOB:  8/10/1987 |
| Violation Date: | 03/27/2018, 05/10/2018 | Sex:   M |
| | | Booking Number:   1817636 |
| Charging Document: | Information | Jail ID Number:   1787554 |

Filing Agency:          District Attorney
Filing Agency Case:    2018G11985
Court Internal ID:      F18903146-1

| CNT | OL | CHARGE |
|-----|-----|--------|
| 001 | FEL | PC 664-187(a) |
| 002 | FEL | PC 245(b) |
| 003 | FEL | PC 246.3(a) |
| 004 | FEL | PC 29800(a)(1) |
| 005 | FEL | PC 25850(a) |

---

**Hearing:** Jury Trial **Results:** Heard **Start time:**
Location: Department 71
Judge: Gary Hoff
Commissioner:
Clerk: Soledad Echeagaray
Court Reporter:  Natalie Kjar

Ciummo and Associates appearing on behalf of Defendant.  Attorney: Mark Asami
Defendant present: Yes

District Attorney appearing on behalf of the People.  Deputy District Attorney: Daniel Walters

Motion.  Submitting Party: People
Type of Motion: Requesting to dismiss and refile pursuant to PC 1387.2 using the same case number.
Oral/Written: Oral

Motion Granted - Dismiss without prejudice

Page 1 of 2

Printed On: 11/13/2018 10:04 AM

--25--

Charles Devon Garrett F18903146

Case Re-filed to a New Case.  Case number: F18903146

As to count 001. Attempted Murder, the following disposition is entered:  Dismissal - Before Trial (P-Motion of People).

As to count 002. Assault With Semiautomatic Firearm, the following disposition is entered:  Dismissal - Before Trial (P-Motion of People).

As to count 003. Discharging Firearm With Gross Negligence, the following disposition is entered:  Dismissal - Before Trial (P-Motion of People).

As to count 004. Possession Of Firearm By A Felon, the following disposition is entered:  Dismissal - Before Trial (P-Motion of People).

As to count 005. Carrying A Loaded Firearm In Public, the following disposition is entered:  Dismissal - Before Trial (P-Motion of People).

Defendant Released on all Counts.

Defendant released on this case only.

Case Disposed.

Page **2** of 2